SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**In the Matter of Scott P. Sigman, An Attorney at Law** (D-126-13) (074489)

**Argued September 9, 2014 -- Decided December 18, 2014**

**PATTERSON, J., writing for a unanimous Court.**

In this attorney disciplinary matter, the Court considers the appropriate level of discipline for respondent Scott P. Sigman, who, as a result of misconduct involving the misappropriation of law firm funds, was brought before New Jersey disciplinary authorities on a motion for reciprocal discipline following imposition of a thirty-month suspension in Pennsylvania.

Respondent was admitted to the bars of New Jersey and Pennsylvania in 2001 and, prior to the proceedings that gave rise to his Pennsylvania suspension, had no history of discipline in either jurisdiction. This matter arose from respondent's employment as an associate in the Philadelphia firm of Bochetto & Lentz, P.C., between July 2005 and March 2009. Under the terms of his employment, respondent could not handle independent client matters or matters not approved by George Bochetto, Esq. Respondent also was prohibited from: (1) referring clients to other attorneys; (2) declining referrals without his employer's consent; and (3) charging retainers or fees to clients or prospective clients without Bochetto's approval. Respondent was entitled to certain percentages of the firm's fees depending on what type of case or fee arrangement existed and whether the client was a referral or had been originated by respondent. For matters referred by an attorney outside the firm, the referring attorney also would receive a percentage of the firm's fees.

Respondent's Pennsylvania suspension, and the New Jersey Office of Attorney Ethics's (OAE) petition for reciprocal discipline, derive from seven allegations of misconduct. Five of the alleged instances of misconduct involved respondent's violation of his firm's referral and fee terms. Specifically, respondent allegedly: (1) handled a matter referred by a former firm attorney without Bochetto's permission and without sharing the $600 fee with the firm; (2) referred a prospective client to a non-firm attorney without Bochetto's knowledge; (3) instructed a client to pay $5,000 to him personally and then lied to Bochetto about the payment; (4) promised a referring attorney a fee without obtaining Bochetto's permission and lied to the firm's bookkeeper that he had originated the client; and (5) referred a client to another attorney without Bochetto's approval and failed to share the referral fee with the firm. The sixth instance of misconduct arose from respondent's misrepresentation to Bochetto regarding his role in a real estate purchase, which caused the firm to misstate certain facts in a letter to the property buyers, and respondent's false testimony in an affidavit and deposition arising from a related insurance dispute. Finally, the seventh instance of misconduct concerned respondent's disclosure of the firm's Westlaw password to an acquaintance who accrued over $3,000 in unauthorized charges.

After respondent's employment with the firm was terminated, he filed a civil lawsuit alleging that the firm had wrongfully retained funds owed to him as referral fees for legal work he had generated. An arbitrator determined that the firm owed respondent $123,942.93. During the disciplinary proceedings, respondent stipulated that the firm lost $25,468.18 as a result of his misconduct and conceded that it was entitled to deduct that amount, as a setoff, from the funds escrowed as part of the arbitration.

The Pennsylvania disciplinary authorities agreed that several mitigating factors applied in respondent's case, including his admission of misconduct and cooperation with authorities, as well as his remorse, lack of a prior disciplinary history, and active involvement with various professional and community organizations. The Pennsylvania Disciplinary Board recommended a thirty-month suspension, which was imposed by the Pennsylvania Supreme Court on February 28, 2013.

On December 20, 2013, the OAE petitioned the Disciplinary Review Board (DRB) for reciprocal discipline, based on respondent's admitted violation of Pennyslvania disciplinary rules, and New Jersey RPCs

1.15(a), 1.15(b), 3.4(a), 8.4(c), and 8.4(d). Reasoning that respondent's conduct constituted a lengthy and premeditated fraud in which he misappropriated funds belonging to his employer and falsely testified in legal proceedings, the OAE sought an order of disbarment. Following a de novo review of the record, the DRB accepted as conclusive the Pennsylvania Disciplinary Board's factual findings, as per Rule 1:20-14(a)(4). A majority of the DRB reasoned that respondent's knowing misappropriation of law firm funds constituted an offense warranting disbarment under New Jersey law. One dissenting member voted to impose a three-year suspension.

Because of the DRB's disbarment recommendation, this Court ordered respondent to show cause on September 9, 2014, why he should not be disbarred or otherwise disciplined.

**HELD:** Respondent's unethical conduct, consisting of repeatedly breaching the trust that must exist between a law firm and the professionals whom it employs, warrants the imposition of a prospective thirty-month suspension of his license to practice law, as reciprocal discipline under Rule 1:20-14.

1. In attorney disciplinary proceedings, the Court is obligated to conduct an independent review of the record and determine whether the violations found by the DRB have been established by clear and convincing evidence. In the context of reciprocal discipline, the process by which New Jersey applies its ethics rules to an attorney admitted in New Jersey, following the imposition of discipline in an ethics proceeding conducted by a sister jurisdiction, the inquiry is limited and generally results in the same discipline as that imposed in the foreign jurisdiction, unless the matter falls within the five exceptions established in Rule 1:20-14(a)(4). In order to serve the interest of judicial economy and promote the imposition of consistent sanctions for the misconduct of an attorney admitted in multiple states, Rule 1:20-14(a)(5) mandates deference to the factfinding of the foreign jurisdiction. (pp. 15-18)

2. This case does not involve the misappropriation of client funds held in a trust or escrow account, and is therefore not governed by In re Wilson, 81 N.J. 451 (1979) or In re Hollendonner, 102 N.J. 21 (1985). Rather, in several matters in the OAE complaint, respondent admittedly misappropriated law firm funds in violation of New Jersey RPCs 1.15(a) and 8.4(c). These violations unquestionably involve serious misconduct warranting substantial discipline, but the Court disagrees with the DRB's conclusion that In re Siegel, 133 N.J. 162 (1993) and similar cases mandate disbarment whenever an attorney knowingly misappropriates law firm funds. In both Siegel and In re Greenberg, 155 N.J. 138 (1998), the Court held that knowing misappropriation of funds, whether from a client or one's partners, will generally result in disbarment. In the wake of those cases, the Court has adopted the DRB's recommendation of disbarment in several disciplinary matters involving lawyers found to have misappropriated law firm resources. However, the rule of Siegel and Greenberg is not absolute, and, in settings involving significant mitigating factors or disputes with law partners, the Court has imposed discipline short of disbarment, ranging from a reprimand to a six-month suspension. (pp. 19-27)

3. The rule of Siegel and Greenberg does not compel diversion from the discipline imposed by Pennsylvania. Rather, the imposition of discipline consistent with that administered by Pennsylvania is particularly appropriate here. The Pennsylvania disciplinary authorities have significant experience with respect to the adjudication of disciplinary matters involving referral fees, a practice that is generally permitted under Pennsylvania's ethical rules but authorized only in limited circumstances in New Jersey. Moreover, compelling mitigating factors in the record, including respondent's lack of a disciplinary history and admission of his wrongdoings, warrant a sanction short of disbarment. Also, there is no allegation or finding that respondent stole client funds, having instead misappropriated referral and legal fees in the context of conflicting payment practices and a deteriorating relationship with his firm. The Court sees no distinction between this case and other cases involving misappropriation from the respondent's firm in which the Court imposed sanctions other than disbarment. In such cases, the sanction of disbarment should not turn on whether an attorney contends that his misappropriation of firm resources is justified, as a form of self-help in an ongoing dispute with his partners about compensation, or candidly admits that his conduct was wrong. Here, respondent admittedly repeatedly breached the trust that must exist between a law firm and the professionals whom it employs, and his misconduct warrants the imposition of a significant sanction. Consequently, respondent is prospectively suspended for a period of thirty months, as reciprocal discipline under Rule 1:20-14. (pp. 27-30)

So Ordered.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE PATTERSON's opinion.**

IN THE MATTER OF

SCOTT P. SIGMAN,

An Attorney at Law

Argued September 9, 2014 – Decided December 18, 2014

On an Order to show cause why respondent
should not be disbarred or otherwise
disciplined.

Jason D. Saunders, Deputy Ethics Counsel,
argued the cause on behalf of the Office of
Attorney Ethics.

Kenneth D. Aita argued the cause for
respondent.

JUSTICE PATTERSON delivered the opinion of the Court.

In an ethics proceeding conducted by the Pennsylvania Office of Disciplinary Counsel (ODC), respondent Scott P. Sigman admitted to violating several Pennsylvania Rules of Professional Conduct. Respondent's disciplinary proceedings arose from his misappropriation of referral and legal fees that should have been paid, in whole or in part, to the law firm that employed him, his misuse of other resources belonging to his employer, and his false testimony regarding insurance proceeds issued in a real estate matter. With respondent's consent, and based on his

1

admissions of wrongdoing, the Supreme Court of Pennsylvania suspended his license to practice law in that state for a period of thirty months.

Following the suspension of respondent's Pennsylvania law license, the New Jersey Office of Attorney Ethics (OAE) moved before the Disciplinary Review Board (DRB) for reciprocal discipline pursuant to Rule 1:20-14(a). A majority of the DRB recommended disbarment, reasoning that respondent had knowingly misappropriated law firm funds and that such misconduct mandates disbarment in New Jersey. A dissenting DRB member voted for a three-year suspension.

Applying the standard of Rule 1:20-14(a), which governs the imposition of reciprocal discipline following disciplinary proceedings conducted by another jurisdiction, we do not find that respondent's misconduct warrants "substantially different discipline" from the sanction imposed by Pennsylvania authorities for conduct that took place during and after his employment with a Philadelphia law firm. Notwithstanding our longstanding rule that a lawyer's misappropriation from a law firm may warrant disbarment, we conclude that the circumstances of this case warrant discipline short of the ultimate sanction of disbarment. Respondent has presented a significant showing of compelling mitigating factors, including his prior record of no disciplinary proceedings, his contribution to the legal

2

profession and his community, his candid admission of wrongdoing, his cooperation with disciplinary authorities, and the ongoing business dispute between respondent and his former law firm, during which his misconduct was reported to Pennsylvania ethics authorities. We do not find in this case compelling reasons to depart from the discipline imposed by our sister jurisdiction.

Thus, in accord with the determination of the Supreme Court of Pennsylvania, we impose a thirty-month suspension of respondent's license to practice law in New Jersey.

I.

We rely on the stipulated summary of the record set forth in the joint petition in support of discipline on consent, filed by the ODC before the Disciplinary Board of the Supreme Court of Pennsylvania, which was the basis for the DRB's decision and recommendation in this case. See R. 1:20-14(a)(5).

Respondent was admitted to the bars of New Jersey and Pennsylvania in 2001. Prior to the proceedings that led to his suspension in Pennsylvania, he had no history of discipline in either jurisdiction.

This matter arose from respondent's employment as an associate in the Philadelphia law firm of Bochetto & Lentz, P.C., from July 5, 2005 through March 6, 2009. Although the record does not reflect that respondent had a written employment

3

agreement, he has admitted that he was aware that certain terms governed his employment with Bochetto & Lentz. Respondent understood that he was barred from handling client matters that were independent of the firm or were not approved by George Bochetto, Esq. (Bochetto), of Bochetto & Lentz. Respondent was also aware that he was prohibited from referring actual or prospective client matters to other attorneys, was not permitted to decline referrals from other lawyers without his employer's consent, and was barred from charging retainers or fees to clients or prospective clients without Bochetto's approval. Respondent understood his obligation to record his time spent on firm-client matters and non-client activity that was related to his employment.

The stipulated record includes a summary of the fee-allocation rules that governed respondent's arrangement with Bochetto & Lentz. For purposes of allocating shares of fees, the law firm evidently considered client matters "originated" by an associate to be distinct from client matters "referred" to that associate by attorneys from other firms; it is unclear what precisely distinguished those two categories. With respect to cases "originated" by an associate, respondent was entitled to receive twenty percent of the fees received by the firm if the matter involved criminal defense or was in the "hourly-paid" category, and thirty-three and one-third percent of the fees

4

received by the firm if the matter was handled on a contingent-fee basis. If the matter was referred by an attorney outside the firm, and the client approved a referral fee arrangement, the referring attorney typically would receive twenty percent of the fees received by the firm and respondent would receive eight percent of the fees. The record does not indicate whether those billing arrangements were memorialized in writing, or whether the basic terms were varied for particular cases.

Respondent's Pennsylvania suspension, and the OAE's petition for reciprocal discipline, derive from seven allegations of misconduct, in violation of several Pennsylvania Rules of Professional Conduct (Pennsylvania RPCs).[1]

The first allegation concerns a representation undertaken by respondent in early 2007. Respondent was retained by a former Bochetto & Lentz attorney to handle a hearing involving the suspension of the client's driver's license. Respondent handled the matter without obtaining permission from Bochetto, and did not share the $600 fee with his firm.[2] Respondent

---

[1] Three of the seven Pennsylvania RPCs violated in this case, 3.4(a), 8.4(c), and 8.4(d), are virtually identical to their New Jersey counterparts. Pennsylvania RPC 1.15(c) was not adopted in New Jersey. The remaining three, Pennsylvania RPCs 1.15(b), 1.15(d), and 1.15(e), have no direct New Jersey counterparts but were incorporated, in substance, in different provisions of New Jersey RPC 1.15.

[2] Under respondent's arrangement with the firm, Bochetto & Lentz was entitled to either $480 generated by the representation if

5

contends that the firm was aware of his representation of the client because he recorded his time, and notes that only a small amount of money was at issue. However, as he stipulated in his Pennsylvania disciplinary proceedings, and as the Pennsylvania ODC found, respondent's conduct violated Pennsylvania RPCs 1.15(a) (duty to keep property of others in identified bank account), 1.15(b) (duty to notify third person of receipt of funds in which third person has interest), and 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation).

The Pennsylvania ODC's second allegation involved respondent's September 2007 referral of a prospective client to another attorney without Bochetto's knowledge or permission. Respondent stipulated, and the ODC found, that he violated Pennsylvania RPCs 1.15(a), 1.15(b), and 8.4(c). Respondent admits in this proceeding that he referred the client without notifying his employer, but he contends that the matter was merely a business dispute between him and his employer.

The third allegation in the Pennsylvania ODC proceedings against respondent arose from his representation of a client in three matters in early 2008. In accordance with the firm's requirements, respondent recorded his time on the file and

the matter was considered "originated" by him, or $432 if it was considered a "referral" matter.

6

arranged for the initial legal fees to be paid by the client's father to Bochetto & Lentz. However, respondent admittedly instructed the client's father to write a $5000 check payable to respondent personally, as payment for a portion of the legal work performed on the client's behalf. He deposited the check in his account and spent the money on personal expenses.

The diversion of the $5000 legal fee was discovered by Boccheto & Lentz after respondent's departure from the firm, when the client's father requested that the money be refunded. Confronted by Boccheto about the disputed funds, respondent lied to his former employer, claiming that the client's father had never sent a check for $5000, and then instructed the client's father not to contact his former firm. Eventually, respondent refunded $4000 of the $5000 paid and retained the remaining $1000, eighty percent of which was payable to Bochetto & Lentz under the fee arrangements that governed his employment. Respondent stipulated, and the ODC found, that this conduct violated Pennsylvania RPCs 1.15(a), 1.15(b), and 8.4(c).

The Pennsylvania ODC's fourth allegation against respondent involved another attorney's referral of a client to respondent in April 2007. Although respondent obtained Bochetto's approval to represent the client, he neglected to advise his firm that he had promised the referring attorney that the firm would pay a referral fee. Moreover, respondent represented to the firm's

7

bookkeeper that he was the originating attorney, entitled to twenty percent of the firm's fees, rather than the recipient of an outside lawyer's referral, which "typically" entitled him to only an eight-percent share of the billings. Respondent admits that, as a result of his misrepresentations to Bochetto & Lentz regarding the origin of the matter, he received $3,988.18 to which he was not entitled under the firm's referral fee procedures, and the referring attorney did not receive the referral fee authorized by Pennsylvania RPC 1.5(e). Respondent stipulated, and the ODC found, that his conduct violated Pennsylvania RPCs 1.15(a), 1.15(b) and 8.4(c). He asserts in this proceeding that the referring attorney would not have been entitled to a referral fee under New Jersey's RPCs, and that this incident constituted a business dispute that did not affect the legal services that he provided on his clients' behalf.

The Pennsylvania ODC's fifth allegation arises from yet another dispute over a referral fee. In June 2007, respondent consulted with a potential client interested in asserting a slip-and-fall claim against a Philadelphia hotel and referred that client to another attorney. Although respondent stipulated that he did not obtain Bochetto's approval before referring the matter to the other attorney, he contends that Bochetto told him that "it was a bad case" and instructed him to "get rid of" the case.

In April 2009, a month after respondent left his employment at Bochetto & Lentz, the attorney to whom the slip-and-fall matter had been referred settled the matter, and paid respondent $28,800, representing one-third of the legal fee that he had been paid for his work on the matter, as a referral fee. As respondent acknowledges, his agreement with Bochetto & Lentz entitled the firm to $19,200 of that fee. However, respondent retained the entire $28,800 for his own use. Respondent stipulated, and the ODC found, that his handling of this referral fee violated Pennsylvania RPCs 1.15(b), 1.15(d) (duty to promptly notify third party of receipt of funds), 1.15(e) (duty to promptly deliver property to which third party is entitled), and 8.4(c).

The sixth allegation concerned respondent's representation of a client whose home in New Jersey had been destroyed in a fire during a foreclosure, raising the possibility of an investigation of arson. In an arrangement approved by Boccheto, respondent and the client agreed in writing in December 2005, that the client would pay a $5000 non-refundable retainer prior to any criminal investigation that might be instituted for an alleged arson. As the originating attorney, respondent was paid $750 by Boccheto & Lentz. After being retained for purposes of the arson investigation, Boccheto & Lentz also represented the

9

client in connection with two charges of driving under the influence.

Following his retention to represent the client in the arson investigation, respondent communicated with attorneys representing potential buyers of the property and their lender, who were attempting to forestall a sheriff's sale and privately acquire the property. The buyers purchased the property, paying off the balance of a mortgage held by a local bank. The real estate purchase agreement entitled the buyers to any insurance proceeds obtained as a result of the fire loss.

Following the sale, the insurance company that had provided coverage for property damage sent to the bank that had held the mortgage of the property a check in the amount of $130,727.45, in satisfaction of its obligation to compensate the bank for the loss of the improvements on the property that had served as collateral for the mortgage loan. Having no remaining interest in the property, the bank endorsed the check and sent it to respondent's client, who in turn directed that respondent deposit it in Boccheto & Lentz's escrow account, evidently without notifying the property's new owners that insurance proceeds had been received.

Several months later, at the client's direction, respondent distributed the escrowed funds. In addition to paying the client's outstanding tax liability in the amount of $13,498,

10

respondent distributed $60,000 to Bochetto & Lentz in payment for the firm's defense of the client's driving-under-the-influence charges, and returned the remaining $57,228.62 to the client. Bochetto & Lentz then paid $12,000 to respondent, who was the attorney credited with originating the representation of the client in the driving under the influence charges. The firm retained the remaining $48,000 of its legal fee. Respondent did not notify the purchasers of the property that the insurance proceeds had been received and disbursed.

Thereafter, the property's new owners asserted a claim to the disbursed insurance proceeds, based on the purchase agreement. Despite his prior involvement with the real estate transaction, respondent claimed that he had not reviewed the purchase agreement and that he was uncertain whether his client had been entitled to the insurance proceeds that had been held in escrow. Following a meeting with respondent, Bochetto advised the purchasers in writing that respondent had been unaware of the purchasers' claim to the insurance proceeds because he had not reviewed the purchase agreement, and that respondent's only legal advice to his client, the seller, regarding the property was that the pending arson investigation did not preclude the sale of the property.

Respondent admitted in the Pennsylvania disciplinary proceeding that he misrepresented to Bochetto his role in the

11

real estate purchase, and that, on the basis of those misrepresentations, Bochetto's letter to the property buyers misstated certain facts. Respondent also admitted that in an affidavit and a deposition given in litigation arising from the insurance dispute, he falsely testified regarding the history of the transaction, his representation of the client and his disbursement of the insurance proceeds.[3] Respondent stipulated, and the Pennsylvania ODC found, that this conduct violated Pennsylvania RPCs 3.4(a) (obstruction of access to evidence), 8.4(c) and 8.4(d) (conduct prejudicial to administration of justice).

The Pennsylvania ODC's seventh and final allegation concerned respondent's disclosure of the Westlaw password assigned to him by Boccheto & Lentz to an acquaintance, who accrued unauthorized Westlaw charges in the amount of $3,662.80. Respondent stipulated, and the Pennsylvania ODC found, that he violated Pennsylvania RPC 8.4(c).

After his employment with Boccheto & Lentz was terminated, respondent filed a civil lawsuit in a Pennsylvania court, alleging that the firm had wrongfully retained funds that were owed to respondent as referral fees for legal work that he had

---

[3] Respondent later characterized the misstatements in his deposition as the result of his faulty memory, and his counsel sought a further deposition to correct "certain mistakes" in respondent's testimony.

12

generated as a firm employee. An arbitrator eventually determined that the firm owed respondent $123,942.93, and the firm held that amount in escrow. Prior to the arbitration award, respondent stipulated during the Pennsylvania disciplinary proceedings that as a result of his misconduct, Boccheto & Lentz lost a total of $25,468.18. He conceded that the firm was entitled to deduct that amount, as a setoff, from the funds escrowed as part of the arbitration; that setoff was incorporated in the arbitration award.

In the joint petition, the ODC and respondent agreed that the following mitigating factors applied in respondent's case: respondent's admission of his misconduct and his violations of the relevant Pennsylvania RPCs; his cooperation with disciplinary authorities; his remorse for his conduct and understanding that he should be disciplined; his lack of a prior disciplinary history; and his active involvement with the Philadelphia Bar Association, a Philadelphia anti-drug community group, and various other legal and volunteer organizations. The joint petition also noted letters written on respondent's behalf from members of the local community and by prominent members of the Philadelphia bar, including a former Philadelphia District Attorney and a law school dean. In accordance with the stipulations set forth in the joint petition, the Pennsylvania Disciplinary Board recommended a thirty-month suspension, and

13

that discipline was imposed by the Pennsylvania Supreme Court by order dated February 28, 2013.

Following the suspension of respondent's Pennsylvania license, his New Jersey disciplinary proceedings commenced. On December 20, 2013, the OAE petitioned the DRB for reciprocal discipline based on respondent's admitted violation of Pennsylvania disciplinary rules, and New Jersey RPCs 1.15(a), 1.15(b), 3.4(a), 8.4(c), and 8.4(d). The OAE did not advocate for a suspension corresponding to the discipline imposed in Pennsylvania. Instead, reasoning that respondent's conduct constituted a lengthy and premeditated fraud in which he misappropriated funds belonging to his employer and testified falsely in an affidavit and a deposition, the OAE sought an order of disbarment.

The DRB conducted a de novo review of the record, which consisted of the joint petition filed in the Pennsylvania proceedings and the parties' written submissions, and issued its recommendations in a Decision dated June 13, 2014. As required by Rule 1:20-14(a)(4), the DRB accepted as conclusive the Pennsylvania Disciplinary Board's factual findings. It determined that respondent had: failed to promptly notify third persons upon receiving funds in which the third persons had an interest, in violation of New Jersey RPC 1.15(b); failed to separately retain funds in which a third person had an interest

14

pending an accounting and severance of their interests, in violation of New Jersey RPC 1.15(c); unlawfully obstructed another person's access to evidence, in violation of New Jersey RPC 3.4(a); converted or knowingly misappropriated law firm funds, in violation of New Jersey RPCs 1.15(a) and 8.4(c); and engaged in conduct prejudicial to the administration of justice, in violation of New Jersey RPC 8.4(d).

A majority of the DRB reasoned that, by virtue of his knowing misappropriation of law firm funds, respondent had committed an offense mandating disbarment under New Jersey law, and did not consider the appropriate sanction for the remaining offenses. A dissenting member of the DRB voted to impose a three-year suspension, noting a concern that, notwithstanding the terms of his employment with Bochetto & Lentz, respondent may have believed that he had a colorable claim to the funds that he retained.

## II.

"Our obligation in an attorney disciplinary proceeding is to conduct an independent review of the record, Rule 1:20-16(c), and determine whether the ethical violations found by the DRB have been established by clear and convincing evidence." In re Pena, 164 N.J. 222, 224 (2000) (citing In re Di Martini, 158 N.J. 439, 441 (1999)). Here, that inquiry occurs in the context of reciprocal discipline, the process by which New Jersey

15

applies its ethics rules to an attorney admitted in New Jersey, following the imposition of discipline in an ethics proceeding conducted by a sister jurisdiction.

Our court rules set forth the procedure for reciprocal discipline. A New Jersey attorney who is disciplined "as an attorney or otherwise in connection with the practice of law in another jurisdiction," must promptly inform the Director of the Office of Attorney Ethics (Director) of the discipline imposed. R. 1:20-14(a)(1). The Director is authorized to file with the DRB, and serve on the respondent, a motion for reciprocal discipline, supported by proof of the judgment or order imposing discipline in the other jurisdiction. R. 1:20-14(a)(2).

In contrast to Rules 1:20-3 through -9, which prescribe a detailed procedure for investigations, formal hearings and appellate review in attorney ethics matters originating in New Jersey, our reciprocal discipline rule envisions a limited inquiry, substantially derived from and reliant on the foreign jurisdiction's disciplinary proceedings. Those proceedings result in the same discipline that the foreign jurisdiction has imposed, unless the matter is within one of the five exceptions set forth in Rule 1:20-14(a)(4):

> [The DRB] shall recommend the imposition of
> the identical action or discipline unless the
> respondent demonstrates, or the [DRB] finds on
> the face of the record on which the discipline

16

in another jurisdiction was predicated that it clearly appears that:

> (A) the [disciplinary order] of the foreign jurisdiction was not entered;
> (B) the [disciplinary order] of the foreign jurisdiction does not apply to the respondent;
> (C) the [disciplinary order] of the foreign jurisdiction does not remain in full force and effect as the result of appellate proceedings;
> (D) the procedure followed in the foreign disciplinary matter was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process; or
> (E) the unethical conduct established warrants substantially different discipline.

The <u>Rule</u> permits the Director to "argue that the law of this state or the facts of the case do or should warrant the imposition of greater discipline than that imposed in" the other jurisdiction, and assigns to the Director "the burden of establishing such contentions by clear and convincing evidence." <u>R.</u> 1:20-14(a)(4). Absent such a showing, "the discipline accorded in New Jersey will ordinarily correspond with that imposed in the other jurisdiction." <u>In re Kaufman</u>, 81 <u>N.J.</u> 300, 303 (1979); <u>see also</u> <u>In re Harris</u>, 115 <u>N.J.</u> 181, 187 (1989).

<u>Rule</u> 1:20-14(a)(5) mandates deference to the factfinding of the foreign jurisdiction in reciprocal discipline proceedings, limited only by the exceptions identified in <u>Rule</u> 1:20-14(a)(4):

17

> In all other respects, a final adjudication in another court, agency or tribunal, that an attorney admitted to practice in this state . . . . is guilty of unethical conduct in another jurisdiction as an attorney or otherwise in connection with the practice of law, shall establish conclusively the facts on which it rests for purposes of a disciplinary proceeding in this state.
>
> [Rule 1:20-14(a)(5).]

Thus, "[w]hen a New Jersey attorney who also is admitted to practice in another jurisdiction is disciplined in that jurisdiction, the other jurisdiction's findings of misconduct will be accepted by the New Jersey Supreme Court in a proceeding under the New Jersey Disciplinary Rules." In re Pavilonis, 98 N.J. 36, 40 (1984) (citing Kaufman, supra, 81 N.J. at 302); see also Harris, supra, 115 N.J. at 187. New Jersey's reliance on the factual findings of the foreign jurisdiction's disciplinary authorities under Rule 1:20-14(a), and its application of discipline identical to that imposed by the foreign jurisdiction absent a showing by clear and convincing evidence that an exception applies, serves the interest of judicial economy and promotes the imposition of consistent sanctions for the misconduct of an attorney admitted to practice in multiple states.

In that setting, we consider whether the OAE has proven by clear and convincing evidence that New Jersey law or the facts of respondent's case warrant the imposition of "greater

18

discipline than that imposed in" Pennsylvania -- in this case, the sanction of disbarment.  R. 1:20-14(a)(4).  As respondent has admitted, by misappropriating funds that belonged to his law firm as alleged in the first, third, and fifth matters in the OAE complaint, he violated two New Jersey RPCs:  RPC 1.15(a), which requires a lawyer to "hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property," and RPC 8.4(c), which provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."  Respondent's violations of these Rules unquestionably involved serious misconduct warranting substantial discipline.  The question is whether the sanction for that misconduct must be disbarment.

This case does not involve the misappropriation of client funds held in a trust or escrow account, and is therefore not governed by In re Wilson, 81 N.J. 451 (1979) or In re Hollendonner, 102 N.J. 21 (1985).  However, the OAE contended, and the DRB concluded, that In re Siegel, 133 N.J. 162 (1993) and similar cases mandate disbarment in all cases involving an attorney's knowing misappropriation of funds owed to his or her law firm.

The Court first explored the quantum of discipline imposed on attorneys who misappropriate their employers' resources in In

19

re Spina, 121 N.J. 378 (1990). There, the respondent, a member of the New Jersey and District of Columbia bars, was employed by an academic entity affiliated with the Georgetown University Law Center. Id. at 379-80. Spina admitted to misappropriating thousands of dollars in donors' contributions to his employer to replenish his chronically low bank balance, using the misappropriated funds for extravagant personal expenses, and submitting fraudulent claims for reimbursement. Id. at 380-83, 390. He pleaded guilty to the offense of taking property without right in violation of the D.C. Criminal Code, the equivalent of a disorderly persons offense under New Jersey law. Id. at 379. Accepting the DRB majority's recommendation of disbarment, the Court rejected Spina's psychiatric defense:

> The quirk of mind that bedevils respondent, however, did not, by his own admission, prevent him from a full realization that his misuse of ILI's money was wrong. So flagrant were the ethical violations that we would not hesitate to disbar had the misconduct arisen out of a lawyer-client relationship. Nor do we believe that we should hesitate here, where the relationship was fiduciary in nature.
> There is no escaping the fact that Spina knowingly misused substantial amounts of his employer's funds over a two-and-one-half-year period, taking quantities of money when his personal checking account ran low, and then lied when confronted by his employer. No discipline short of disbarment can be justified.
>
> [Id. at 390.]

20

Thus, the respondent in Spina was disbarred for a protracted scheme by which donors' intended charitable gifts were diverted for the attorney's personal use.

Three years later, the Court considered attorney misappropriation of funds belonging to a law firm in Siegel, supra, 133 N.J. at 163. The respondent in Siegel, a partner at a large law firm, violated RPC 8.4 by submitting to his firm thirty-four false requests for disbursements in the course of several years. Id. at 163-64. Rejecting the recommendation of a majority of the DRB that it impose a three-year suspension, the Court stated that it was "impressed by the DRB dissent, which saw no ethical distinction between the prolonged, surreptitious misappropriation of firm funds and the misappropriation of client funds." Id. at 168. The Court rejected Siegel's contention that his conduct was justified by his "[f]rustration and disillusionment with [his] 'firm['s] culture' and dissatisfaction with [his] pay." Id. at 172. Citing Spina as well as authority from other jurisdictions, the Court held:

> These opinions make clear that knowingly misappropriating funds -- whether from a client or from one's partners -- will generally result in disbarment. Although the relationship between lawyers and clients differs from that between partners, misappropriation from the latter is as wrong as from the former. A plainly-wrong act is

21

> not immunized because the victims are one's partners.
>
> [Id. at 170.]

The Court discussed and refined the principle of In re Siegel in another matter involving the misappropriation of law firm funds, In re Greenberg, 155 N.J. 138 (1998). There, the DRB found that the respondent, Joel Greenberg, signed over two settlement checks to a client that should have been maintained in the trust account of Greenberg's firm. Id. at 141. He then instructed the client to issue a check payable to Greenberg personally in payment of legal fees. Ibid. The DRB also found that Greenberg falsified disbursement requests, using the proceeds to pay his mortgage and other personal expenses. Id. at 141-43, 158. Greenberg asserted a psychiatric defense, contending that he suffered from a form of depression and that he had not intended to misappropriate his firm's funds. Id. at 145-47.

Rejecting Greenberg's argument that mitigating factors justified a sanction short of disbarment, the Court reaffirmed its holding in Siegel, which it characterized as an application of the Wilson rule regarding misappropriation of client funds. It recognized "'no ethical distinction between a lawyer who for personal gain willfully defrauds a client and one who for the same untoward purpose defrauds his or her partners.'" Id. at

22

153 (quoting Siegel, supra, 133 N.J. at 167). The Court construed the "Wilson rule, as described in Siegel," to mandate the disbarment of lawyers found to have misappropriated firm funds "'[i]n the absence of compelling mitigating factors justifying a lesser sanction, which will occur quite rarely.'" Ibid. (quoting Siegel, supra, 133 N.J. at 167-68 (citations omitted)).

In the wake of Siegel and Greenberg, the Court has adopted the DRB's recommendation of disbarment in several disciplinary matters involving lawyers found to have misappropriated law firm resources. See In re Leotti, 218 N.J. 6 (2014) (ordering disbarment of attorney who diverted to personal accounts client payments to his law firm for legal fees in several matters, In re Leotti, DRB No. 13-344 (Apr. 11, 2014) (slip op. at 4-7)); In re Denti, 204 N.J. 566, 567 (2011) (ordering disbarment of attorney who maintained protracted scheme to defraud two law firms with which he was affiliated, In re Denti, DRB No. 09-346 (Feb. 16, 2011) (slip op. at 2-3)); In re Staropoli, 185 N.J. 401 (2005) (on motion for reciprocal discipline, ordering disbarment of attorney who personally retained legal fee derived from settlement proceeds, two-thirds of which belonged to his firm, In re Staropoli, DRB No. 04-319 (Feb. 25, 2005) (slip op. at 2-3)); In re Epstein, 181 N.J. 305 (2004) (ordering disbarment of attorney who diverted for personal use client

23

checks written to law firm in payment of legal bills, In re Epstein, DRB No. 04-061 (May 19, 2004) (slip op. at 1-3)); In re Le Bon, 177 N.J. 515 (2003) (ordering disbarment of attorney who instructed client to pay him personally for legal fees owed to his firm, In re Le Bon, DRB No. 02-432 (May 2, 2003) (slip op. at 3)).

The rule of Siegel and Greenberg, however, is not, and has never been, absolute. Greenberg, supra, 155 N.J. at 153; Siegel, supra, 133 N.J. at 167-68. The Court has recognized in other settings that there are cases that warrant discipline short of disbarment.

For example, the Court reprimanded, rather than disbarred, the respondent attorney in In re Bromberg, 152 N.J. 382, 383 (1998), despite its conclusion that he had violated RPC 8.4(c). The attorney in Bromberg, a non-equity partner in a small law firm, was engaged in a dispute with his partners about the terms of their financial arrangement and Bromberg's disappointing volume of business. In re Bromberg, DRB No. 97-129 (Dec. 16, 1997) (slip op. at 5-7). Experiencing financial pressures due to the termination of his salary, the attorney instructed a client to send a payment for legal fees to him personally, rather than to the law firm. Id. at 7-8. The attorney intercepted client checks made out to his firm, forged endorsements, deposited the checks into an attorney business

24

account that he kept separate from the firm's accounts, and used the funds to pay personal expenses. Ibid. He did not dispute that he appropriated the checks without the firm's permission, but claimed that he had the right to the checks because of the firm's suspension of his salary, which he contended was a breach of the partnership agreement. Id. at 10.

The DRB found a violation of New Jersey RPCs 1.15(b) and 8.4(c). Id. at 20. However, it cited the confused state of the partners' business arrangement as an important factor and concluded that the attorney's belief that he owned a partnership interest in the firm "led him to understand that he was entitled to receive the checks" from the client. Id. at 19. The DRB found substantial mitigation under the circumstances of that case and recommended a reprimand. Id. at 24. The Court concurred. Bromberg, supra, 152 N.J. at 383.

In another law firm misappropriation matter, In re Paragano, 157 N.J. 628 (1999), the Court imposed a six-month suspension on the respondent attorney, who admitted that he violated New Jersey RPC 8.4(c) when he spent $83,954 in law firm money on his personal expenses during a dispute with his partner. In re Paragano, DRB No. 98-093 (Sept. 28, 1998) (slip op. at 3). The attorney contended that the expenditures were proper, based on an agreement with his partner when they formed their firm, and conceded nothing more than that he improperly

25

recorded, as law firm expenses, personal expenditures that he was authorized to make with firm resources.  Id. at 8.  Based on the absence of any concession by the respondent that his conduct had been improper, the DRB distinguished Siegel and Greenberg, and declined to disbar the respondent.  Id. at 8-10.

In a third case involving misappropriation from a law firm, In re Glick, 172 N.J. 319, 320 (2002), the Court reprimanded, but did not disbar, a respondent who violated New Jersey RPC 1.15(b) and RPC 8.4(c) by personally collecting legal fees owed to his firm as a "form of self-help" following a dispute over his profit share.  In re Glick, DRB No. 01-151 (Jan. 29, 2002) (slip op. at 4).  In reasoning adopted by the Court, the DRB concluded that the respondent's conduct in Glick was less serious than that of the respondent in Bromberg, because Glick did not forge endorsements on checks or misrepresent the status of the fees to his firm.  Id. at 6.  Similarly, in In re Spector, 178 N.J. 261 (2004) the Court reprimanded, but did not disbar, an attorney who violated New Jersey RPC 1.15(b), RPC 1.15(c), and RPC 8.4(c) by retaining fees that he had earned while at his previous firm in the setting of a dispute with his former partners regarding an employment agreement.  In re Spector, DRB No. 03-041 (Oct. 2, 2003) (slip op. at 2-8).

Finally, in In re Nelson, 181 N.J. 323 (2004), the Court concurred with the DRB's recommendation of a reprimand as the

26

appropriate discipline for an attorney who misappropriated law firm funds in the midst of a dispute with his law partners over a range of issues, including the partners' concealment of malpractice suits from him, improper referral fees, and attempts to appropriate the lawyer's clients. In re Nelson, DRB No. 04-057 (May 19, 2004) (slip op. at 3-6). Notwithstanding his violations of New Jersey RPC 8.4(c), the respondent in Nelson retained his license to practice law. Nelson, supra, 181 N.J. at 323.

Thus, the Court has recognized circumstances that warrant a lesser sanction than that imposed in Siegel and Greenberg.

### III.

In light of the special rules that govern reciprocal discipline, and the circumstances of this case, we consider whether the DRB correctly concluded that disbarment was mandated here. We do not conclude that the rule of Siegel and Greenberg compels us to diverge from the discipline imposed by our sister jurisdiction and disbar respondent.

The imposition of discipline consistent with that administered by Pennsylvania is particularly appropriate in this case. Much of the misconduct at issue in this case involves the payment and receipt of referral fees, a practice that is authorized only in limited circumstances in New Jersey, but is generally permitted under Pennsylvania's ethical rules. Compare

27

New Jersey RPCs 1.5(e), 7.2(c), 7.3(d), with Pennsylvania RPCs 1.5(e), 7.2(c), 7.3. Long experienced in the adjudication of disciplinary matters involving referral fees, the Pennsylvania disciplinary authorities compared respondent's ethical violations with misconduct committed by other Pennsylvania attorneys in referral-fee matters, and determined that a thirty-month suspension was the appropriate discipline here.

Our jurisprudence does not compel divergence from the Pennsylvania authorities' determination of discipline in this case. We find "compelling mitigating factors" in this record that warrant a sanction short of disbarment. Respondent had no prior history of discipline in either Pennsylvania or New Jersey. As his supporting letters attest, he has made significant contributions to the bar and to underserved communities for many years. He cooperated with disciplinary authorities and admitted his wrongdoing. There is no allegation, let alone a finding, that respondent stole funds belonging to a client. Instead, respondent's misappropriation of referral and legal fees occurred in the context of conflicting fee payment practices and a deteriorating relationship with his law firm -- a relationship that ended in litigation over a different referral fee, in which he ultimately prevailed. Indeed, it was only after respondent's conflict with his former firm over referral fees that his misconduct was

28

reported to ethics authorities. These factors distinguish this case from the circumstances of Siegel and Greenberg.

We do not share the DRB's view that the misconduct in this case is fundamentally different from the misconduct found in Bromberg, supra, DRB No. 97-129 (slip op. at 5-7), Glick, supra, DRB No. 01-151 (slip op. at 4), Spector, supra, DRB No. 03-041 (slip op. at 2-8), and Nelson, supra, DRB No. 04-057 (slip op. at 3-6) -- each involving misappropriation from the respondent's law firm -- in which we imposed sanctions other than disbarment. The DRB distinguished this case from those four matters on the ground that the respondent in each of those cases reasonably believed that he was justified in converting the firm's resources for personal use because he was embroiled in a dispute with his law firm over compensation issues. The DRB stated that no such justification was attempted here.

We are not persuaded by that reasoning. We conclude that the sanction of disbarment should not turn on whether an attorney contends that his misappropriation of firm resources is justified, as a form of self-help in an ongoing dispute with his partners about compensation, or candidly admits to disciplinary authorities that his conduct was wrong. The underlying misappropriation at issue in Bromberg, Glick, Spector, and Nelson is not inherently different from that of respondent here. Moreover, as in Bromberg, Glick, Spector, and Nelson, the ethics

29

matter in this case arose in a business dispute between the attorney and his firm.  As in those cases, we conclude that disbarment is not the appropriate sanction for the misconduct at issue.

Respondent's misconduct was unquestionably serious.  By his own admission, he repeatedly breached the trust that must exist between a law firm and the professionals whom it employs.  He diverted referral fees and legal fees that were owed to his firm, and devoted them to his personal use.  His conduct warrants the imposition of a significant sanction, namely the thirty-month suspension of his license to practice law, as reciprocal discipline under Rule 1:20-14.  We conclude that this discipline is sufficient in this matter.

IV.

Based on our independent review of the record, and consistent with the determination of the Pennsylvania disciplinary authorities, we prospectively suspend respondent's license to practice law in New Jersey for a period of thirty months.  Respondent is also ordered to reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE PATTERSON's opinion.

30

SUPREME COURT OF NEW JERSEY

NO.   D-126                              SEPTEMBER TERM 2013

APPLICATION FOR   _____

DISPOSITION   ____Order to Show Cause Why Respondent Should____

                ____Not be Disbarred or Otherwise Disciplined____




IN THE MATTER OF

SCOTT P. SIGMAN,

An Attorney at Law




DECIDED   _____December 18, 2014_____

OPINION BY   _____Justice Patterson_____

CONCURRING OPINION BY   _____

DISSENTING OPINION BY   _____


| CHECKLIST | SUSPEND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 7 | |

1

IN THE MATTER OF

SCOTT P. SIGMAN,

AN ATTORNEY AT LAW

(Attorney No. 032032001)

ORDER

**FILED**

DEC 18 2014

CLERK

It is ORDERED **SCOTT P. SIGMAN** of **PHILADELPHIA, PENNSYLVANIA,** who was admitted to the bar of this State in 2001, is suspended from the practice of law for a period of thirty months, effective January 16, 2015, and until the further Order of the Court; and it is further

ORDERED that respondent comply with Rule 1:20-20 dealing with suspended attorneys; and it is further

ORDERED that pursuant to Rule 1:20-20(c), respondent's failure to comply with the Affidavit of Compliance requirement of Rule 1:20-20(b)(15) may (1) preclude the Disciplinary Review Board from considering respondent's petition for reinstatement for a period of up to six months from the date respondent files proof of compliance; (2) be found to constitute a violation of RPC 8.1(b) and RPC 8.4(c); and (3) provide a basis for an action for contempt pursuant to Rule 1:10-2; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight

Committee for appropriate administrative costs and actual expenses incurred in the prosecution of this matter, as provided in Rule 1:20-17.

WITNESS, the Honorable Stuart Rabner, Chief Justice, at Trenton, this 18th day of December, 2014.

CLERK OF THE SUPREME COURT

The foregoing is a true copy of the original on file in my office.

CLERK OF THE SUPREME COURT
OF NEW JERSEY